STATE OF NORTH CAROLINA v. JIM EDWARD HASELDEN

No. 665A01

(Filed 28 March 2003)

**1. Appeal and Error— preservation of issues—failure to object at trial—challenge for cause**

Although defendant contends the trial court erred in a capital first-degree murder case by excusing for cause a prospective juror based on his felony convictions in another state, this assignment of error is dismissed because: (1) defendant failed to preserve this issue for appellate review since he did not object at trial; and (2) defendant is not entitled to review of this assignment of error under the plain error rule.

**2. Appeal and Error— preservation of issues—failure to object at trial—leg shackles**

Although defendant contends his right to a fair trial in a capital first-degree murder case was violated when the trial court ordered that defendant be shackled during jury selection and by failing to review the order during the trial, this assignment of error is dismissed because: (1) defendant failed to preserve this issue for appellate review since he did not object at trial; (2) defendant is not entitled to review of this assignment of error under the plain error rule; and (3) in any event, defendant's prior altercations and threats more than justify the trial court's decision to use leg shackles to restrain him.

1

STATE v. HASELDEN

[357 N.C. 1 (2003)]

**3. Jury— capital trial—selection—voir dire—questions concerning parole and parole eligibility**

The trial court did not err in a capital first-degree murder case by denying defendant's request to voir dire jurors regarding their opinions and beliefs concerning parole and parole eligibility, because: (1) neither the North Carolina or United States Supreme Court has ever held that a defendant has a right, constitutional or otherwise, to question jurors about parole eligibility; (2) the jury in the present case was informed on the meaning of life imprisonment according to N.C.G.S. § 15A-2002; and (3) during deliberations the jurors neither indicated any confusion regarding the meaning of life without parole nor requested any additional instruction from the trial court.

**4. Discovery— first-degree murder—failure to disclose witness statements—motion to dismiss—motion for mistrial**

The trial court did not err in a capital first-degree murder case by denying defendant's motion to dismiss and/or motion for a mistrial based on the State's failure to disclose exculpatory evidence including prior statements to law enforcement officers by various State witnesses and failure to turn over court documents filed in the child custody litigation between the victim and her estranged husband, because: (1) there was no connection between any of these statements and defendant's decision to stipulate the various facts at trial; (2) defendant received all of the prior statements of the State witnesses after these witnesses had testified on direct examination at trial, and defendant used some of these prior statements to cross-examine the witnesses regarding inconsistencies between earlier statements and statements made at trial; and (3) defendant had in his possession at trial the documents relating to the custody litigation.

**5. Evidence— victim impact—emotional outbursts of family— no plain error**

The trial court did not commit plain error in a capital first-degree murder case by admitting victim-impact evidence and allegedly failing to control emotional outbursts by the victim's family because even assuming arguendo that it was error, the jury would not have reached a different result given defendant's confession to another person and defendant's stipulation at trial that he was responsible for the victim's death.

**6. Evidence— photographs—area victim's body found**

The trial court did not commit plain error in a capital first-degree murder case by admitting two photographs of the area where the victim's body was found even though defendant contends they depict a cross and memorial flowers which do not accurately reflect the scene at the time the body was discovered, because: (1) a witness testified that the photographs were a fair and accurate representation of the property and of the location where the victim's body was found; and (2) the probative value of the photographs far outweighed the danger of any undue prejudice.

**7. Evidence— photographs—victim's body**

The trial court did not abuse its discretion in a capital first-degree murder case by admitting three photographs of the victim's body even though defendant stipulated that he caused the victim's death with the infliction of multiple gunshot wounds, because: (1) the photographs not only depicted the condition of the victim's body when found, but also corroborated defendant's confession to another man that defendant had killed the victim; (2) each photograph was taken at a different angle which offered a unique perspective on the nature and location of the victim's wounds; and (3) by showing the number and location of the victim's wounds, the photographs helped to circumstantially prove premeditation and deliberation.

**8. Homicide; Robbery— first-degree murder—dangerous weapon—motion to dismiss**

The trial court did not err by denying defendant's motion to dismiss the charges of robbery with a dangerous weapon and first-degree murder, because defendant's own statements, both before and after the murder, provide adequate support for a finding that the use of a gun to kill the victim and the subsequent taking of her purse and car were part of one continuous transaction.

**9. Sentencing— aggravating circumstances—robbery with a dangerous weapon**

The trial court did not err in a first-degree murder sentencing proceeding by submitting robbery with a dangerous weapon as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(5), because the evidence supported the trial court's submission of the (e)(5) aggravating circumstance.

**10. Criminal Law— prosecutor's argument—capital sentencing—mitigating circumstances**

The prosecutor's arguments in a capital sentencing proceeding that the victim did not have the benefit of any mitigating circumstances and that mitigating circumstances do not have to be found unanimously or beyond a reasonable doubt were not improper.

**11. Criminal Law— prosecutor's argument—capital sentencing—mitigating circumstances—age of defendant and victim—victim's mother—victim impact evidence**

The prosecutor's argument in a capital sentencing proceeding in which he compared the mitigating circumstance of the age of defendant to the age of the victim and the age of the victim's daughter and contrasted the mitigating circumstance that defendant was considerate and loving to his mother by referencing the victim's mother in the courtroom were proper statements of victim impact evidence which the jury could consider.

**12. Criminal Law— prosecutor's argument—capital sentencing—Biblical references**

The prosecutor's use of Biblical references in arguing to the jury in a capital sentencing proceeding that the Bible does not prohibit the death penalty was not so grossly improper that the trial court erred by failing to intervene ex mero motu where the prosecutor was anticipating that defense counsel might offer religious sentiment during closing argument; the prosecutor did not suggest that the Bible mandates a death sentence for murder but instead told the jury that the Bible verses he was citing were "not a mandate . . . but [were] the [Biblical] authority for those of you who worry about that"; the prosecutor told the jury that its sentencing decision should be based on the law and the evidence; and the trial court instructed the jury to follow the law as provided to it.

**13. Criminal Law— prosecutor's argument—capital sentencing—death penalty deserved**

The prosecutor did not improperly inject his personal beliefs or opinions into his jury argument in a capital sentencing proceeding by his remarks to the effect that defendant deserved to die; rather, the prosecutor permissibly argued that the characteristics of the murder for which defendant was convicted were such that a death sentence was deserved.

STATE v. HASELDEN

[357 N.C. 1 (2003)]

**14. Criminal Law— prosecutor's argument—capital sentencing—consideration of victim's life**

The prosecutor's argument in a capital sentencing proceeding that "If you let this murderer walk out of this courtroom with his life then you are saying that his life is worth more that [the victim's] life" simply reminded the jury that, in addition to considering defendant's life, it should also consider the life of the victim and was a proper extension of the prosecutor's earlier argument concerning victim impact evidence.

**15. Sentencing— aggravating circumstance—murder especially heinous, atrocious, or cruel**

The trial court did not err in a first-degree murder sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel, because: (1) the (e)(9) circumstance is neither unconstitutionally vague nor overbroad; (2) defendant murdered the victim in a remote secluded area where he knew they would be alone; (3) the evidence supports an inference that the victim was left in her last moments aware of but helpless to prevent impending death; and (4) defendant left the victim after inflicting the first gunshot wound but then returned and shot her again.

**16. Sentencing— death penalty—proportionate**

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was convicted based on malice, premeditation and deliberation, and under the felony murder rule; (2) the jury found the aggravating circumstances under N.C.G.S. § 15A-2000(e)(3) that defendant had been previously convicted of a felony involving the use of violence, under N.C.G.S. § 15A-2000(e)(5) that the murder was committed by defendant while he was engaged in the commission of robbery with a firearm or flight after committing robbery with a firearm, and under N.C.G.S. § 15A-2000(e)(9) that the murder was especially heinous, atrocious, or cruel; and (3) defendant took the victim to an isolated spot in the woods, made the victim get on her knees while she pled for her life, and defendant shot the victim and returned to shoot the victim again.

Justice BRADY concurring in a separate opinion.

Chief Justice LAKE joins in the concurring opinion.

**STATE v. HASELDEN**

[357 N.C. 1 (2003)]

Justice EDMUNDS dissenting.

Justice ORR joins in the dissenting opinion.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge James M. Webb on 6 June 2001 in Superior Court, Stokes County, upon a jury verdict finding defendant guilty of first-degree murder. On 11 March 2002, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 4 February 2003.

> *Roy Cooper, Attorney General, by William P. Hart, Special Deputy Attorney General, and Amy C. Kunstling, Assistant Attorney General, for the State.*

> *James R. Parish for defendant-appellant.*

WAINWRIGHT, Justice.

On 20 March 2000, a Stokes County grand jury indicted Jim Haselden (defendant) for murder and robbery with a dangerous weapon. Defendant was tried capitally before a jury at the 21 May 2001 Special Session of Superior Court, Stokes County. On 31 May 2001, the jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of robbery with a firearm. On 6 June 2001, following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to 103 months minimum and 133 months maximum imprisonment for the robbery conviction.

Evidence presented at trial showed that defendant and the victim, Kim Sisk, lived next door to each other in the McConnell Road Trailer Park in Greensboro, North Carolina. Defendant stipulated at trial that on or about 20 December 1999, he inflicted multiple gunshot wounds to Kim which caused her death. Defendant also stipulated that he had sexual intercourse with Kim on the same date.

The State presented considerable evidence at trial concerning the days preceding the murder. Around 12 December 1999, Aaron Maness, a friend of defendant's, visited defendant at the trailer park and loaned him a saw. Defendant took the saw into his trailer and

soon returned with it. When Maness went inside defendant's trailer, Maness noticed a .16-gauge, sawed-off shotgun with gray tape on the handle. Maness also saw some shells near the shotgun. Later that evening, Maness watched defendant place part of the sawed-off stock in a dumpster.

Around 14 December 1999, Kim told Maness that defendant had agreed to give her $100.00 to drive defendant to Virginia. On 15 December 1999, around 10:30 or 11:00 p.m., defendant went for a ride with a friend, Mark Ingold. Defendant had a sawed-off shotgun and ammunition with him. Defendant said that he was tired of being broke and wanted money and a car. Defendant told Ingold to pull up and stop beside another car because defendant wanted to "car jack a car." Ingold refused to stop beside a car but did eventually stop so defendant could use the bathroom. At this point, defendant shot a stop sign. Shooting the sawed-off shotgun caused a cut on defendant's hand.

On 20 December 1999, around 11:00 a.m., Dorothy Hare, Kim's mother, went to see Kim at her trailer. Kim was wearing jeans, a blue shirt, boots, and a wristwatch. Kim was moving out of her trailer and packing her belongings in her teal green Camaro. Around 6:00 or 6:30 p.m., Chad Sisk, Kim's husband, saw Kim when she came to see their six-year-old daughter, Heather. Between 8:00 and 8:30 p.m., James Lucas saw Kim, and she told him that she was getting ready to take a neighbor to the mountains for $100.00. Lucas and his daughter saw Kim leave the trailer park that night around 9:15 or 9:30 p.m. Kim was driving her teal green Camaro and defendant was in the car. Kim's purse, which contained jewelry, was in the car. Kim usually carried money in her purse.

The next day, 21 December 1999, defendant arrived at his niece's residence in Morganton, North Carolina. Defendant was driving a teal green Camaro. Defendant had a pair of jeans and a trash bag full of clothes. The jeans were women's size six. Kim wore clothing size five or six. Defendant offered to let his niece have the clothes.

Later that night, defendant asked a resident of his niece's trailer park where he could run a car into a lake, blow it up, or burn it. Defendant eventually drove the Camaro to Burkemont Mountain, in Burke County, and left it in the woods near a logging road. When defendant got out of the Camaro, he had a plastic bag and a duffel bag. A sawed-off shotgun with duct tape around the handle was in the plastic bag. Defendant sold the shotgun to Jeremy Crawley for thirty

dollars. When Crawley and a companion later fired the gun, the gun left gashes on their hands. They had noticed a similar gash on defendant's hand.

On 23 December 1999, William Duggins discovered Kim Sisk's dead body in the woods in Stokes County. The body was located just over one mile from the residence of defendant's half-brother, Timothy Williamson. Defendant had previously lived with Williamson after defendant's release from prison. When Williamson told defendant that a girl's body had been found near his house, defendant replied, "Just tell Mom I love her, and I'll probably never see or talk to you guys again."

Law enforcement officers responding to the scene observed the body lying on its back. The body had massive trauma to the left side of the face. The left eye was dislodged. There were wounds to the right cheek. The body was clothed in jeans, a dark pullover shirt, hiking boots, and a wristwatch. A plastic sleeve from a shotgun shell was in the hair. Tooth or bone fragments were located just beyond the body on the left side. Semen and sperm were found in Kim's panties. The DNA profile subsequently obtained from this evidence matched defendant's DNA profile.

On 24 December 1999, Dr. Donald Jason performed an autopsy on the body. Dr. Jason found two shotgun wounds to the head and determined that these wounds were the cause of death. One wound was to the right cheek; powder stippling indicated that this wound was caused by a close-proximity shot. The second wound was to the front, left, mid-cheek. This wound was consistent with Kim being in a kneeling position and looking up when she was shot. Dr. Jason concluded that Kim could have remained conscious for at least an hour after receiving the wound to the left side of her face. The wound to the right side of her face would have resulted in almost immediate loss of consciousness. Dr. Jason concluded that the wounds could have been inflicted as much as ten minutes apart.

On 26 December 1999, defendant was living in Georgia with Willie Harper. Defendant told Harper that he had just gotten out of prison for "cutting a guy." Defendant admitted to Harper that he had killed a girl named Kim. Defendant said that his fingerprints were on the car and that his semen was in Kim. Defendant explained that Kim had been his next-door neighbor and that he was going to give her $100.00 to take him to Virginia. Defendant confessed to Harper that he had killed Kim with a sawed-off shotgun at night near some woods.

STATE v. HASELDEN

[357 N.C. 1 (2003)]

Defendant told Harper that he had made Kim get on her knees. Defendant said that Kim had pleaded, "Jim don't shoot me, Jim don't shoot me," four or five times, and then defendant "blew her whole face off." Defendant said that he went down the street but then returned and shot Kim in the face again. Defendant told Harper that this shot caused Kim's body to jump off the ground. Defendant said he sold the shotgun to some "rednecks" for thirty dollars.

At the time of Kim's murder, defendant was on parole for a prior conviction for assault with a deadly weapon. Defendant told Harper that he violated his parole when he fled from North Carolina after the murder. Defendant wanted Harper to help him obtain a gun because if the police caught defendant, he was not going back alive.

Harper eventually reported defendant's confession to Harper's boss, Mark Polson. Polson contacted the police, who subsequently arrested defendant. Throughout their investigation, the police never located Kim's purse or wallet.

## JURY SELECTION

[1] Defendant first assigns error to the trial court's excusal of prospective juror Robert Sexton for cause based on Sexton's felony convictions in another state. Defendant contends that the trial court violated N.C.G.S. § 9-3 by not inquiring whether Sexton's citizenship rights had been restored. See N.C.G.S. § 9-3 (2001) (prohibiting prospective jurors from serving if they have been convicted of a felony and have not had their citizenship restored).

During jury selection, the trial court gave prospective jurors the opportunity to provide reasons why they should not serve on the jury. Prospective juror Sexton informed the trial court that he was unsure of his eligibility because of several felony convictions against him in Texas during the 1970s. The trial court asked if Sexton had "receive[d] any documentation indicating that [his] citizenship rights had been restored." Sexton replied that he had "asked one time for a full pardon, and they denied it." The trial court informed Sexton that a pardon was different from restoration of citizenship. Nonetheless, the trial court excused Sexton for cause "out of an abundance of caution" "based upon [Sexton's] representation that [he had] been convicted of a felony, and [was] unsure as to whether or not [his] citizenship ha[d] been restored."

Defendant contends that Sexton was not subject to being challenged for cause. Defendant contends that prospective juror Sexton

did not need documentation restoring his citizenship rights because his rights were automatically restored under N.C.G.S. § 13-1(5). *See* N.C.G.S. § 13-1(5) (2001) (providing for automatic restoration of citizenship rights for a person convicted of a felony in another state upon the occurrence of an "unconditional discharge of such person by the agency of that state having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon").

Defendant has failed to preserve this issue for appellate review. The record reveals no indication that defendant objected at trial to the excusal of prospective juror Sexton for cause. This Court will not consider arguments based upon matters not presented to or adjudicated by the trial court. N.C. R. App. P. 10(b)(1); *see also State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991). "Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court." *State v. Jaynes*, 342 N.C. 249, 263, 464 S.E.2d 448, 457 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). Additionally, defendant is not entitled to review of this assignment of error under the plain error rule. "[T]his Court has not applied the plain error rule to issues which fall within the realm of the trial court's discretion, and we decline to do so now." *State v. Steen*, 352 N.C. 227, 256, 536 S.E.2d 1, 18 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001).

This assignment of error is procedurally barred and without merit.

[2] In another assignment of error, defendant contends that his due process rights to a fair trial were violated when the trial court ordered him shackled during jury selection and failed to review the order during the trial. According to defendant, the shackles prohibited him from standing when he was introduced to prospective jurors, thus prejudicing the jury by giving them the impression that defendant was rude, insolent, disrespectful, or did not care.

During jury selection, the trial court became aware that defendant was restrained by leg shackles. Deputies in charge of courtroom security made a written request that the trial court order the restraints to remain in place throughout the trial. In support of their request, the deputies informed the court that defendant had been involved in two altercations while awaiting trial: defendant threw urine and feces at another person, and defendant assaulted another inmate with a razor blade embedded in a toothbrush. A Stokes County

jail employee also made statements supporting the request for leg shackles. According to the statement, defendant had said that "when he was sentenced, . . . he had something for a few people that were going to be at his trial." In addition, defendant had said that "when he was sentenced and he got the death sentence that the fat bastard [referring to his attorney] is going to get it." Based on this information, the trial court "direct[ed] that the defendant while in the courtroom be restrained with a form of leg restraint with the instruction that at no time is any juror to be in [a] position to view the leg restraints." The trial court further noted that "defendant's table appears to be [an] average sized defense table with plywood that seems to cover at least three sides of the table front and each side. The defendant's feet and the leg restraint are concealed from view of this Court and [are] concealed from the view of jurors who are brought in the courtroom."

We first note that defendant has failed to preserve this issue for appellate review. The record reveals, and defendant concedes, that he voiced no objection at trial to being restrained by leg shackles. As such, defendant's assignment of error is procedurally barred. N.C. R. App. P. 10(b)(1); *see also Eason*, 328 N.C. at 420, 402 S.E.2d at 814. Moreover, defendant is not entitled to plain error analysis because the matter was largely within the discretion of the trial court. *See Steen*, 352 N.C. at 256, 536 S.E.2d at 18. In any event, defendant's prior altercations and threats more than justify the trial court's decision to use leg shackles to restrain him.

This assignment of error is procedurally barred and without merit.

[3] In his next assignment of error, defendant argues that the trial court erred in denying his request to *voir dire* jurors regarding their opinions and beliefs concerning parole and parole eligibility. Defendant concedes that this Court has generally prohibited disclosure of information concerning parole in capital cases. *See State v. Price*, 326 N.C. 56, 83, 388 S.E.2d 84, 99-100, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990). Defendant also concedes that under N.C.G.S. § 15A-2002, the trial judge is required to instruct the jury, "in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (2001). Nonetheless, defendant argues that he had the right to inform the jury of the punishment that may be imposed upon conviction of murder, because

"N.C.G.S. § 84-14 authorizes the attorney in jury trials to argue 'the whole case as well of law as of fact.'" (Quoting N.C.G.S. § 84-14 (19__) (repealed 1995 and recodified as N.C.G.S. § 7A-97).) We disagree.

Neither this Court nor the United States Supreme Court has ever held that a defendant has a right, constitutional or otherwise, to question jurors about parole eligibility. *State v. Neal*, 346 N.C. 608, 617, 487 S.E.2d 734, 739-40 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998). Contrary to defendant's assertions, the jury in the present case was informed of the meaning of life imprisonment. Using the exact language of N.C.G.S. § 15A-2002, the trial court charged the jury that "[a] sentence of life imprisonment means a sentence of life without parole." Moreover, during deliberations, the jurors neither indicated any confusion regarding the meaning of life without parole nor requested any additional instruction from the trial court.

This assignment of error is overruled.

### GUILT-INNOCENCE PHASE

[4] In his next two assignments of error, defendant argues that the trial court erred in denying his motion to dismiss and/or his motion for a mistrial based on the State's failure to disclose exculpatory evidence. Specifically, defendant contends that the State failed to provide him with prior statements to law enforcement officers by State's witnesses Malinda Ivey, Bryan Richard Thomas, Sammy Brewer, Larry Dean Beam, Jeremy Crawley, and Aaron Maness until after those witnesses had testified on direct examination at trial. Defendant also contends that the State failed to turn over court documents filed in the child-custody litigation between the victim and her estranged husband, Chad Sisk.

According to defendant, if the State had timely produced the statements and documents referenced above, defendant would not have stipulated to his involvement in the murder or that he was guilty of at least second-degree murder. After a thorough review of the record, we can ascertain no connection between the statements defendant cites above and defendant's decision to stipulate to various facts at trial. Such an argument, in the face of the overwhelming evidence of defendant's guilt, defies fundamental reason.

There is no general constitutional or common law right to discovery in criminal cases. *Weatherford v. Bursey*, 429 U.S. 545, 559, 51 L. Ed. 2d 30, 42 (1977); *State v. Alston*, 307 N.C. 321, 335, 298 S.E.2d

631, 641 (1983). However, the State is required to disclose "evidence [that] is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963). This constitutional duty requires the State only to turn over such information at trial, not prior to trial, because "[d]ue process is concerned that the suppressed evidence might have affected the outcome at trial and not that the suppressed evidence might have aided the defense in preparing for trial." *State v. Hardy*, 293 N.C. 105, 127, 235 S.E.2d 828, 841 (1977); *see also* N.C.G.S. § 15A-903(f)(1)-(2) (2001) (providing that statements of State's witnesses are not discoverable before the witnesses have testified on direct examination but are discoverable upon motion by defendant before his cross-examination of the witnesses).

Our review of the record reveals that defendant received all of the prior statements of Malinda Ivey, Sammy Brewer, Bryan Richard Thomas, Larry Dean Beam, Jeremy Crawley, and Aaron Maness after these witnesses had testified on direct examination at trial. Indeed, defendant used some of these prior statements to cross-examine the witnesses regarding inconsistencies between earlier statements and statements made at trial. Similarly, defendant had in his possession at trial the documents relating to the custody litigation between the victim and her estranged husband, Chad Sisk, and used them to cross-examine Sisk.

We therefore conclude that the trial court correctly denied defendant's motion to dismiss and motion for a mistrial.

This assignment of error is overruled.

[5] By his next assignments of error, defendant contends the trial court erred in admitting irrelevant and emotionally charged victim-impact evidence that he contends was grossly and improperly prejudicial. Defendant has waived appellate review of these issues by his failure to object to them at trial. *See* N.C. R. App. P. 10(b)(1). We nonetheless review this issue for plain error. Plain error analysis is applied when our review of the entire record reveals that the alleged error is a fundamental error so prejudicial that justice cannot have been done. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). To prevail, the " 'defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result.' " *State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12 (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)), *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000).

STATE v. HASELDEN

[357 N.C. 1 (2003)]

In the present case, defendant objects to various portions of testimony, such as testimony by Kim's mother and Kim's husband that Kim was attempting to overcome a drug addiction, that Kim had recently rededicated her life to the Lord, and that Kim had reconciled with her husband and renewed her wedding vows. Defendant also argues that the trial court failed to control emotional outbursts by the victim's family and failed to act *ex mero motu* to admonish and prevent the victim's family from these outbursts.

After reviewing all of the evidence to which defendant objects, we find no plain error. Moreover, assuming *arguendo* that it was error to admit the evidence in issue, we fail to see how the jury would have reached a different result in defendant's case. Defendant confessed to Willie Harper that he killed the victim. At trial, defendant stipulated that he was responsible for the victim's death. We cannot conclude that the jury would have reached a different result had the evidence in issue been excluded.

These assignments of error are without merit.

[6] Defendant next assigns error to the admission of two photographs of the area where the victim's body was found. Defendant contends that the photographs, which depict a cross and memorial flowers at the scene, do not accurately reflect the scene at the time the body was discovered. Defendant concedes that this argument is reviewable only for plain error. We find no error, plain or otherwise, in the trial court's decision to admit the photographs into evidence.

"A photograph of the scene of a crime may be admitted into evidence if it is identified as portraying the locale with sufficient accuracy." *State v. Smith*, 300 N.C. 71, 75, 265 S.E.2d 164, 167 (1980). The trial court must weigh the photographs' probative value against the unfair danger of prejudice in determining the photographs' admissibility. N.C.G.S. § 8C-1, Rule 403 (2001); *State v. Goode*, 350 N.C. 247, 258, 512 S.E.2d 414, 421 (1999). "This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *Goode*, 350 N.C. at 258, 512 S.E.2d at 421 (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)) (alteration in original).

In the present case, State's witness William Duggins used the photographs to illustrate to the jury where he found the victim's body.

STATE v. HASELDEN

[357 N.C. 1 (2003)]

Duggins testified that the photographs were a fair and accurate representation of his property and of the location where he found the victim's body. The probative value of the photographs far outweighed the danger of undue prejudice to the defendant. Accordingly, we find no error in the trial court's decision to admit the photographs of the crime scene. *See State v. Rogers*, 316 N.C. 203, 223, 341 S.E.2d 713, 725 (1986) (admitting photographs of the crime scene for illustrative purposes where a witness testified that the photograph was a fair and accurate representation of the scene even though the photograph was not made at the time of the murder), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

This assignment of error is overruled.

[7] Defendant also assigns error to the trial court's admission of three photographs of the victim's body. Defendant contends the use of the three photographs was excessive, inflammatory, and unduly prejudicial, thus denying him of his constitutional right to a fair trial. Specifically, defendant argues that the photographs were improperly admitted in light of his stipulation that he had caused Kim's death with the infliction of multiple gunshot wounds. We disagree.

The three photographs at issue were used during the testimony of Captain Craig Carico, who was one of the first law enforcement responders to the scene where Kim's body was found. Carico testified that he took the photographs and that they fairly and accurately depicted the condition of Kim's body when found. The first photograph showed a close-up view of Kim's head. The remaining two photographs depicted Kim's left side from foot to head and Kim's right side from foot to head.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526. A defendant's stipulation as to the cause of death does not preclude the use of photographs "to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree." *Id.*; *see also State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982). Whether an excessive number of photographs has been used is a matter largely within the trial court's discretion. *Hennis*, 323 N.C. at 285,

372 S.E.2d at 527. Factors a court may consider include what the photographs depict, the level of detail, the manner of presentation, and the scope of accompanying testimony. *Id.*

In the present case, the photographs not only depicted the condition of Kim's body when found, but also corroborated defendant's confession to Willie Harper that he had killed Kim in a wooded area by "[blowing] her whole face off." *See State v. Hyde,* 352 N.C. 37, 54-55, 530 S.E.2d 281, 293 (2000) (upholding the admission of fifty-one photographs of the victim's body where the photographs corroborated details of defendant's confession), *cert. denied,* 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). Moreover, each photograph was taken at a different angle, offering a unique perspective on the nature and location of Kim's wounds. *See id.* at 54, 530 S.E.2d at 293 (photographs were admissible because they depicted the different wounds inflicted on the victim); *State v. Blakeney,* 352 N.C. 287, 310, 531 S.E.2d 799, 816 (2000) (photographs and videotape were admissible because each illustrated either a unique perspective on how the victim was killed or contained unique detail of the condition and location of the victim's body as it pertained to the overall crime scene), *cert. denied,* 531 U.S. 1117, 148 L. Ed. 2d 780 (2001) . Finally, by showing the number and location of Kim's wounds, the photographs helped to circumstantially prove premeditation and deliberation. *See Hennis,* 323 N.C. at 284, 372 S.E.2d at 526.

We therefore conclude that the trial court did not abuse its discretion in determining that the probative value of the photographs outweighed the danger of unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403.

This assignment of error is therefore overruled.

[8],[9] Defendant next assigns error to the trial court's denial of his motion to dismiss the charges of robbery with a dangerous weapon and first-degree murder based upon a theory of felony murder because of insufficiency of the evidence presented at the close of all the evidence. In a related assignment of error, defendant also objects to the submission of robbery with a dangerous weapon as an aggravating circumstance at the sentencing proceeding. *See* N.C.G.S. § 15A-2000(e)(5) (2001) ("The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery . . . .") Specifically, defendant argues that the State failed to establish that a continuous transaction

occurred between the use of deadly force and the taking of Kim's car and personal property.

Although defendant's arguments on this issue involve both guilt-innocence and sentencing, we elect to address the arguments here for purposes of consistency.

We first note that defendant's only motion to dismiss the charges against him was based on alleged inadequacies in the murder indictment and the State's failure to disclose exculpatory evidence as required under *Brady*, 373 U.S. 83, 10 L. Ed. 2d 215. Defendant never made a motion to dismiss based on the sufficiency of the evidence. We further note that defendant also failed to object to the submission of the (e)(5) aggravating circumstance on the basis that defendant was engaged in a robbery with a dangerous weapon at the time of the murder. Finally, defendant does not argue plain error in the present appeal. As such, defendant has failed to preserve these assignments of error for appellate review. N.C. R. App. P. 10(b)(3); *State v. Gainey*, 355 N.C. 73, 97, 558 S.E.2d 463, 479 (defendant failed to preserve his challenge to the submission of the (e)(5) aggravating circumstance where he made no objection at trial and did not assign plain error on appeal), *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 165 (2002). In an abundance of caution, however, we have reviewed the evidence supporting defendant's robbery conviction.

The essential elements of robbery with a dangerous weapon are: "(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998); *see also* N.C.G.S. § 14-87(a) (2001). We have previously explained the temporal connection needed between the use of the dangerous weapon and the taking of property as follows:

> To be found guilty of robbery with a dangerous weapon, the defendant's threatened use or use of a dangerous weapon must precede or be concomitant with the taking, or be so joined by time and circumstances with the taking as to be part of one continuous transaction. Where a continuous transaction occurs, the temporal order of the threat or use of a dangerous weapon and the taking is immaterial.

*State v. Olson*, 330 N.C. 557, 566, 411 S.E.2d 592, 597 (1992) (citation omitted).

The evidence supporting the robbery conviction should be viewed in the light most favorable to the State, giving the State the benefit of all reasonable inferences. *Call*, 349 N.C. at 417, 508 S.E.2d at 518. Circumstantial evidence may be sufficient to support a conviction even when "the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988).

In the present case, the evidence, when viewed in the light most favorable to the State, shows that defendant's own statements, both before and after the murder, provide adequate support for a finding that the use of a gun to kill Kim and the subsequent taking of her purse and car were part of one continuous transaction. *See Gainey*, 355 N.C. at 89, 558 S.E.2d at 474 ("defendant's confession provides adequate support for a finding that defendant took the victim's Mustang from him by threatening his life with a gun"). On 15 December 1999, defendant told friends that he was tired of being broke and wanted money and a car. Defendant also expressed a desire to take a car from someone at gunpoint. Kim was last seen alive a few days later on 20 December 1999, packing her Camaro with her personal belongings and driving away with defendant. Kim's body was discovered on 23 December 1999, with fatal gunshot wounds to her face. Defendant stipulated at trial that he inflicted these wounds. Defendant also confessed to Willie Harper that he shot Kim, abandoned her Camaro in some woods, and sold the shotgun for thirty dollars. Kim's purse, which she had packed in the Camaro and was known to contain jewelry, was never found. This evidence supports a reasonable inference that defendant shot Kim to fulfill his earlier expressed desire to carjack someone and have money and a car.

The jury could therefore reasonably infer that there was "one continuous transaction with the element of use or threatened use of a dangerous weapon so joined in time and circumstances with the taking as to be inseparable." *State v. Hope*, 317 N.C. 302, 306, 345 S.E.2d 361, 364 (1986). The State introduced evidence sufficient to permit a rational jury to conclude beyond a reasonable doubt that defendant committed armed robbery. Moreover, the evidence supported the trial court's submission of the (e)(5) aggravating circumstance.

These assignments of error are without merit.

## CAPITAL SENTENCING PROCEEDING

In another set of assignments of error, defendant argues that numerous portions of the State's sentencing proceeding closing arguments were improper. Defendant argues that the cumulative nature of the errors of law and fact in these closing arguments resulted in prejudicial error warranting a new sentencing proceeding.

Defendant concedes that his trial counsel failed to object to any of these closing arguments at trial. This Court has repeatedly held that arguments to which defendant fails to object at trial "must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). In order to obtain a new sentencing proceeding based on improprieties in the prosecutor's closing argument, defendant must show that the prosecutor's argument " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 437 (1974), *quoted in State v. McCollum*, 334 N.C. 208, 223-24, 433 S.E.2d 144, 152 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

"Prosecutors have a duty to advocate zealously that the facts in evidence warrant imposition of the death penalty, and they are permitted wide latitude in their arguments." *State v. Williams*, 350 N.C. 1, 25, 510 S.E.2d 626, 642, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). Counsel is permitted to argue all facts presented as well as every reasonable inference that can be drawn from the facts. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986).

In his brief, defendant cites at great length numerous portions of the prosecutor's closing argument. After examining each of defendant's arguments in light of the principles enunciated above, we conclude that the trial court did not err in failing to intervene *ex mero motu* during the prosecutor's closing argument. We consider each of defendant's arguments in turn.

[10] First, defendant argues that the prosecutor, in an attempt to make the jury resentful toward defendant, denigrated the procedural safeguards provided to defendant by the United States and North Carolina Constitutions. The prosecutor stated:

Now, we get to the second issue, which is: Do you find any mitigating circumstances exist? Guess what? Even though he did this to Kim Dalton Sisk we give him the benefit of—it doesn't have to be unanimous to find his mitigating factors. Or even though she's dead and buried and gone and he's alive, it's almost like you're the winner, Mr. Haselden. You lived. You killed her. So you get the benefit of all these mitigating factors that she didn't. Not only that, but you don't even have to find them by unanimous. They can be any one of you or two of you can find them, or more. And they don't have to be beyond a reasonable doubt.

A prosecutor is permitted to legitimately belittle the significance of the mitigating circumstances. *State v. Billings*, 348 N.C. 169, 186-87, 500 S.E.2d 423, 433-34, *cert. denied*, 525 U.S. 1005, 142 L. Ed. 2d 431 (1998). In the present case, the prosecutor argued that Kim did not have the benefit of any mitigating circumstances. The prosecutor also correctly pointed out that mitigating circumstances do not have to be found unanimously or beyond a reasonable doubt. Taken in context, the prosecutor's argument to the jury concerning the mitigating circumstances was proper. Contrary to defendant's argument, the prosecutor never denigrated or belittled the constitutional requirements concerning mitigating circumstances.

Defendant's assignment of error is without merit.

[11] Defendant next argues the following portion of the prosecutor's closing argument was improper:

The age of the defendant at the time of this murder is a mitigating circumstance. Can you believe that? The age of him, 21, 22, 23, whatever it is. That should be a mitigating circumstance, Mr. Right-from-wrong. How old was she? How old is Heather [the victim's daughter]? You can't consider that though.

The defendant is considerate and loving to his mother. Well, I'll be dog. He has some qualities that are in him. What about this mother [the victim's mother]? Can't consider that though.

This prosecutorial argument was a proper attempt to offer victim impact evidence for the jury. The prosecutor's argument showed the jury that the victim was a unique human being and assisted the jury in evaluating defendant's culpability for the murder. *See Payne v. Tennessee*, 501 U.S. 808, 823, 115 L. Ed. 2d 720, 734 (1991). The State is permitted to counteract the defendant's mitigating evidence by

STATE v. HASELDEN

[357 N.C. 1 (2003)]

arguing that the victim was a unique individual whose death represents a loss to society and to the victim's family. *Id.*

In the portion of closing argument in issue, the prosecutor first compared the age of defendant to the age of the victim and the age of the victim's daughter. The prosecutor next contrasted the mitigating circumstance that defendant was considerate and loving to his mother by referencing the victim's mother in the courtroom. All of these factors, the victim's age, the age of the victim's daughter, and the effect of the murder on the victim's mother, were relevant considerations for the jury. Accordingly, the prosecutor's argument was proper.

Defendant's assignment of error is without merit.

[12] Defendant next contends that the prosecutor argued to the jury that the death penalty is mandated by the Bible. The prosecutor argued in pertinent part as follows:

> . . . As his Honor has instructed you, that side over there gets the last argument. I can't begin to think of what they would argue in this matter. But I suspect that at least one of their arguments is going to be that the death sentence is contrary to the Good Book. It's contrary to our Christian ethics. And then they're probably going to rare back and say, thou shalt not kill. If you're up on the Good Book, what does that mean? That means you and I shalt not kill. It doesn't mean that you shouldn't do it pursuant to the statutes and the law and order. You see, just a few verses below that, right after that thou shalt not kill, just a few verses below it it says, he that smiteth a man so that he die shall surely be put to death. Just a few verses below that. I suggest to you that that is Biblical authority for the death sentence. Not a mandate that you do it in any one case, but it is the authority for those of you [who] worry about that.
>
> . . . .
>
> Now, listen to this, ladies and gentlemen of the jury. In that Good Book it says this in Numbers 35. I believe it's starting at verse 6, I mean 16. If he smite him with an instrument of iron so that he die he is a murderer: The murderer shall surely be put to death. If he smite him with throwing a stone wherewith he may die, and he die, he is a murderer: And the murderer shall surely be put to death.

Listen to this ladies and gentlemen of the jury. This is in the Bible, in Numbers, Chapter 35, verse 29. So these things shall be for a statute of judgment—

Ladies and gentlemen of the jury, North Carolina Statute 15A-2000 is a statute of judgment. That is simply that, a statute of judgment. And what does it say in the Bible about a statute of judgment? A statute of judgment unto you throughout your generations and all your dwellings. Whosoever killeth any person, the murderer shall be put to the death by the mouth of witnesses. Moreover ye shall take no satisfaction for the life of a murderer which is guilty of death, but he shall surely be put to death. That's the statutes of judgment.

. . . .

You know, I'm going to make one more comment about the Bible. If you ever had any doubt—this is the New Testament, I understand. If you ever had any doubt about capital punishment in the Bible, remember when Jesus was on the cross, beside of him on each side, if I recall correctly, is two thieves. He told one of them, he said, you'll be in heaven with me today, some words to that effect. Now, he had the power to take himself away from justice and get down off of that cross. He had the power to take those two criminals down and put them on the ground and let them walk away, but he didn't, did he? It's probably why we say, God have mercy on your soul, because he said a soul, or at least that one. But he didn't take justice away from man. He didn't take them down off the cross. That's the strongest argument I can think of. He could've done it right then and there if he had wanted to, but he didn't.

In analyzing Biblical arguments, as with any allegedly improper closing argument, we consider whether the prosecutor's argument " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden*, 477 U.S. at 181, 91 L. Ed. 2d at 157 (quoting *Donnelly*, 416 U.S. at 643, 40 L. Ed. 2d at 437). More often than not, this Court has concluded that this Biblical argument is within the acceptable parameters allowed to counsel when arguing hotly contested cases. *State v. Bond*, 345 N.C. 1, 36, 478 S.E.2d 163, 182 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). Indeed, in *State v. Williams*, this Court found the following argument was not so grossly improper as to have required that the trial court intervene *ex mero motu*:

And I believe Mr. Warmack or Mr. Dixon [defense counsel] may stand up here and tell you . . . that they think capital punishment may be somehow contrary to Christian ethics. . . . And they may quote such chapters from the Bible as thou shall not kill and things like that, ladies and gentlemen.

I want to quote a few things to you first of all. And right behind thou shall not kill in the Book of Exodus in verse 21, chapter 21, verse 12, it says: He that smiteth a man, so that he die, shall be surely put to death. . . .

And right behind that, ladies and gentlemen, in Numbers, chapter 35, verse 18, it states: Or if he smite him with a hand weapon of wood, wherewith he may die, and he die, he is a murderer: the murderer shall surely be put to death. That's in the Book of Numbers. . . .

So these things shall be a statute of judgment unto you throughout your generation and in all your dwellings. Whoever killeth any person, the murderer shall be put to death by the mouth of the witnesses. And moreover, you shall take no satisfaction for the life of a murderer which he is guilty of death but he shall surely be put to death.

Ladies and gentlemen, none of us and none of you in this courtroom, . . . are going to be sitting on that jury taking joy in what you have to do today. . . . But that doesn't make it any less necessary, ladies and gentlemen, based on the facts and based on the law . . . .

The statute of judgment. That's what this Bible—what this good book says, ladies and gentlemen, the statute of judgment. And we are trying this case under statute 15A-2000, ladies and gentlemen. That's the statute of judgment and that's what his honor is going to give.

350 N.C. at 25-26, 510 S.E.2d at 642-43 (alterations in original).

We have held similar religious arguments not to be reversible error in other cases. *See, e.g., Billings,* 348 N.C. at 187, 500 S.E.2d at 434 (finding prosecutor's argument that "the law is divinely inspired by referring to the law as a 'statute of judgment' " was not so grossly improper as to require the trial court to intervene *ex mero motu*); *Bond,* 345 N.C. at 36, 478 S.E.2d at 182 (finding that the trial court

properly overruled defendant's objection to an argument almost identical to the first paragraph of argument at issue in the present case where the prosecutor stated "he that smiteth a man so that he die shall surely be put to death," in anticipation of defendant's usage of "thou shalt not kill").

In the present case, we conclude that the prosecutor's closing argument was not so grossly improper as to warrant a new sentencing proceeding. The prosecutor here was addressing a potential defense argument that the death penalty is contrary to Christian doctrine. *See Bond,* 345 N.C. at 36, 478 S.E.2d at 182 (recognizing that prosecutors are forced to anticipate and address the potential Biblical arguments that defendants often make in death cases); *see also State v. Oliver,* 309 N.C. 326, 359-60, 307 S.E.2d 304, 326 (1983). Considering the atrocity of the present murder and the few defense strategies available to defendant in his closing argument, it seems reasonable for the prosecution to anticipate that defendant might offer religious sentiment during his closing argument.

Moreover, the prosecutor argued to the jury that the Bible did not prohibit the death penalty. Contrary to defendant's argument, however, the prosecutor did not suggest that the Bible mandates a death sentence. Indeed, the prosecutor told the jury that the Bible verses he was citing were "[n]ot a mandate . . . but [were] the [Biblical] authority for those of you [who] worry about that." Additionally, the prosecutor in the present case told the jury that its sentencing decision should be based on the law and the evidence. Finally, the trial court instructed the jury to follow the law as provided to it. Accordingly, we conclude that the prosecutor's use of Biblical references was not so grossly improper that the trial court erred by failing to intervene *ex mero motu.*

Nonetheless, as we have done on several occasions, we strongly encourage counsel

> that they should base their jury arguments solely upon the secular law and the facts. Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials.

*Williams,* 350 N.C. at 27, 510 S.E.2d at 643.

Defendant's assignment of error is overruled.

**[13]** Defendant next argues that the prosecutor improperly injected his personal views and opinions into closing argument. The pertinent portion of the prosecutor's closing argument is as follows:

> . . . The very fabric of our justice deterrent system is on the line in this case. If this isn't especially heinous, atrocious and cruel killing that deserves the death sentence, I don't know what would be. I can't imagine the facts that would be. If ever we're going to use the death penalty it is in this case.
>
> . . . .
>
> . . . How much worse can it get? If you believe in the death penalty, if you can be part of it, if you can do it, then how much worse would it have to be than this for you to do it? I can't imagine. I hope I don't ever have to try that case, if it has to be worse.
>
> Ladies and gentlemen, [defendant] deserves to die. He deserves no less than what Kim Sisk received out there on December 20th. He deserves the same punishment. But we're a little too humane in this country for that. We can't give him the same punishment. But ladies and gentlemen, nevertheless, he deserves to die. And that's what we're here asking you for.

It is improper for an attorney to inject his personal beliefs or opinions into closing argument. N.C.G.S. § 15A-1230 (2001). Prosecutors are permitted to offer argument concerning the circumstances of the murder and whether these circumstances warrant imposition of the death penalty. *See, e.g., State v. Hill,* 347 N.C. 275, 298, 493 S.E.2d 264, 277 (1997) (concluding that the prosecutor's argument that "this may be the most atrocious crime that has occurred here in Harnett County" was not grossly improper), *cert. denied,* 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998); *State v. Larry,* 345 N.C. 497, 530, 481 S.E.2d 907, 926 (finding no error in prosecutor's argument that the defendant qualified for death penalty because the defendant was the "worst of the worst"), *cert. denied,* 522 U.S. 917, 139 L. Ed. 2d 234 (1997); *Johnson,* 298 N.C. at 368-69, 259 S.E.2d at 761 (concluding that the prosecutor's argument that murder was "one of the worst murder cases I've ever seen" was not prejudicial).

The remarks at issue in the present case were not a prosecutorial attempt to inject personal belief or opinion into closing argument. Rather, the prosecutor permissibly argued that the characteristics of this murder were such that a death sentence was deserved. *See Hill,* 347 N.C. at 298, 493 S.E.2d at 277.

Defendant's assignment of error is without merit.

[14] Defendant also argues that the prosecutor improperly stated to the jury, "If you let this murderer walk out of this courtroom with his life then you are saying that his life is worth more than Kim Sisk's life."

As we noted above, the prosecutor in this case properly offered victim-impact evidence for the jury's consideration. Victim-impact evidence is one way for the prosecution to counteract the defendant's mitigating evidence. *See Payne*, 501 U.S. at 821-24, 115 L. Ed. 2d at 734. In the present case, defendant requested, and the trial court submitted, numerous mitigating circumstances concerning defendant's life. Among these mitigating circumstances were: (1) defendant is considerate and loving to his mother; and (2) as a child, defendant was sweet, loving, and obedient. The prosecutorial argument at issue here simply reminded the jury that in addition to considering defendant's life, the jury should also consider the life of the victim. *See id.* at 821-24, 115 L. Ed. 2d at 734. This argument was a natural and proper extension of the prosecutor's earlier argument concerning victim impact evidence.

Defendant's assignment of error is overruled.

[15] Finally, defendant contends the trial court erred in submitting the (e)(9) aggravating circumstance to the jury. *See* N.C.G.S. § 15A-2000(e)(9) (2001) ("The capital felony was especially heinous, atrocious, or cruel."). Defendant argues that the (e)(9) aggravating circumstance is unconstitutionally vague and contends that there was not sufficient evidence to warrant its submission to the jury. We disagree.

We first note that defendant failed to raise at trial the argument that the (e)(9) aggravating circumstance is unconstitutionally vague, and defendant is thus barred from raising this issue on appeal. *See State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988). In any event, we have repeatedly considered and rejected this argument. *See, e.g., State v. Call*, 353 N.C. 400, 424, 545 S.E.2d 190, 205 (holding that the (e)(9) aggravating circumstance is neither unconstitutionally vague nor overbroad), *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001). We see no reason to depart from our prior rulings on this issue.

We now turn our attention to defendant's contention that the submission of the (e)(9) aggravating circumstance was unsupported by

the evidence. We examine the evidence in the light most favorable to the State, as any contradictions or discrepancies in the evidence must be resolved by the jury. *Id.* Whether the submission of the (e)(9) aggravating circumstance is warranted depends on the particular facts of each case. *State v. Brewington,* 352 N.C. 489, 525, 532 S.E.2d 496, 517 (2000), *cert. denied,* 531 U.S. 1165, 148 L. Ed. 2d 992 (2001).

In *State v. Gibbs,* we described the types of murders which warrant submission of the (e)(9) aggravating circumstance:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd,* 321 N.C. 301, 319, 364 S.E.2d 316, 328 [, *sentence vacated on other grounds,* 488 U.S. 807, 102 L. Ed. 2d 18] (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown,* 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985)[, *cert. denied,* 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373], including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet,* 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown,* 315 N.C. at 65, 337 S.E.2d at 827.

335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993), *cert. denied,* 512 U.S. 1246, 129 L. Ed. 2d 881 (1994).

In the present case, the State's evidence revealed that defendant murdered Kim in a remote, secluded area where he knew they would be alone. *See Lloyd,* 321 N.C. at 319, 364 S.E.2d at 328 (the defendant killed the victim at a time he knew the victim would be alone). Defendant forced Kim to get on her knees, and while she was begging him not to shoot her, defendant "blew her whole face off." This evidence supports an inference that Kim was left in her last moments aware of but helpless to prevent impending death. *See Hamlet,* 312 N.C. at 176, 321 S.E.2d at 846. Indeed, defendant left Kim after inflicting the first gunshot wound, but then returned and shot her again, causing her body to jump off the ground. *See State v. Anthony,* 354 N.C. 372, 435, 555 S.E.2d 557, 597 (2001) (the defendant shot the victim once, then shot her a second time while the victim was helpless on the ground and begging for her life), *cert. denied,* —— U.S. ——, 153 L. Ed. 2d 791 (2002); *State v. Golphin,* 352 N.C. 364, 480-81, 533 S.E.2d

168, 243 (2000) (although the victim was already incapacitated by the first shot, he was shot "multiple times as he lay on the ground moaning"), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). We therefore conclude that the evidence, when viewed in the light most favorable to the State, supports the trial court's submission of the (e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises eleven additional issues that this Court has previously decided contrary to defendant's position: (1) the murder indictment failed to adequately allege first-degree murder; (2) the murder indictment failed to allege premeditation and deliberation, essential elements of first-degree murder; (3) the "short form" murder indictment failed to allege all the necessary elements of the offense; (4) the death penalty statute, N.C.G.S. § 15A-2000, is unconstitutional; (5) imposition of the death penalty violates the United States Constitution, the North Carolina Constitution, and North Carolina common law; (6) the trial court erred in instructing the jury on Issue Three to continue to Issue Four if the mitigating circumstances were of equal value and failed to outweigh the aggravating circumstances; (7) the trial court erred in using the term "may" in sentencing Issues Three and Four, thereby making consideration of mitigating evidence discretionary with the sentencing jurors; (8) the trial court erred in its instructions defining the burden of proof applicable to the mitigating circumstances by using the inherently ambiguous and vague terms "satisfaction" and "satisfy"; (9) the trial court erred in placing upon defendant the burden of persuading the jury that mitigating circumstances exist and have mitigating value; (10) the trial court erred in instructing the jurors that in order to answer any of the final questions for Issues One, Three, and Four, they must be unanimous; and (11) the trial court erred in instructing jurors to reject proven mitigating evidence on the basis that it had no mitigating value.

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. We therefore reject these arguments.

## PROPORTIONALITY REVIEW

[16] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to

review and determine: (1) whether the evidence supports the jury's finding of the aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, the jury convicted defendant of first-degree murder based on malice, premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury found all three aggravating circumstances submitted: (1) defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed by defendant while defendant was engaged in the commission of robbery with a firearm or flight after committing robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and (3) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted five statutory mitigating circumstances for the jury's consideration. The jury did not find that any of these statutory mitigating circumstances existed. Of the fourteen nonstatutory mitigating circumstances submitted by the trial court, the jury found five to exist: (1) defendant is borderline retarded, (2) defendant has a substance abuse history, (3) defendant is the product of a deprived social environment and his early life was fairly chaotic, (4) defendant's insight, judgment, and behavior control are all poor at times, and (5) defendant as a teenager hung around with the "wrong crowd," which resulted in substance abuse and a behavior change.

After thoroughly examining the record, transcript, briefs, and oral arguments, we conclude that the evidence fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65

L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court concluded that the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162.

We have found the death sentence disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted on the basis of malice, premeditation, and deliberation and under the felony murder rule. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, this Court has repeatedly noted that "a finding of first-degree murder based on theories of premeditation and deliberation and of felony murder is significant." *State v. Bone*, 354 N.C. 1, 22, 550 S.E.2d 482, 495 (2001), *cert. denied*, 535 U.S. 940, 152 L. Ed. 2d 231 (2002).

In the present case, defendant took the victim to an isolated spot in the woods. Defendant made the victim get on her knees. The victim pled with defendant four or five times, "Jim don't shoot me, Jim don't shoot me." Defendant admitted that, at this point, he "blew her whole face off." Defendant left the scene and headed down the street, but then returned and shot the victim in the face again. Defendant told Harper that this shot caused Kim's body to jump off the ground. We conclude that the gruesome facts of the present murder are sufficient to distinguish the present case from those in which we found a death sentence disproportionate.

Moreover, this Court has held that four aggravating circumstances (namely, N.C.G.S. § 15A-2000(e)(3), (e)(5), (e)(9) and (e)(11)) are sufficient standing alone to support a death sentence. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). In the present case, the jury found three of these four aggravating circumstances: (1) defendant had been previously convicted of a felony involving the

use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed by defendant while defendant was engaged in the commission of robbery with a firearm or flight after committing robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and (3) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). Each of the aggravating circumstances found in the present case, standing alone, would thus independently support the death sentence.

In sum, we conclude that the facts of the present case clearly distinguish this case from those in which this Court has held a death sentence disproportionate.

We also compare this case with the cases in which this Court has found the death penalty to be proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we review all cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998). After thoroughly analyzing the present case, we conclude that this case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the characteristics of this defendant and the crime he committed, we are convinced the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate or excessive.

Accordingly, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. The judgments and sentences entered by the trial court must therefore be left undisturbed.

NO ERROR.

Justice BRADY concurring.

I agree with the majority that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. I write sep-

arately to emphasize a point regarding the prosecutor's biblical remarks to the jury during closing arguments. I agree wholeheartedly with the well-established principle that "it is the secular law of North Carolina which is to be applied in our courtrooms." *State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). However, it is my belief that neither this principle nor any other within our jurisprudence prevents prosecutors from presenting biblical references during closing argument in capital cases.

As so eloquently noted by United States Supreme Court Justice William Douglas over fifty years ago, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313, 96 L. Ed. 954, 962 (1952). This maxim is reflected in the practices of our government, beginning at its inception and continuing today. Our Founding Fathers never intended that we utilize the Establishment Clause of the United States Constitution or any other laws to sterilize our public forums by removing all references to our religious beliefs. Arlin M. Adams & Charles J. Emmerich, *A Nation Dedicated to Religious Liberty: The Constitutional Heritage of the Religion Clauses* 51-52 (Univ. of Penn. Press 1990); *see also School Dist. of Abington v. Schempp*, 374 U.S. 203, 294, 10 L. Ed. 2d 844, 899 (1963) (Brennan, J., concurring) (asserting that "the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers"). This was evident in the actions of the first Congress, which, three days before approving the final draft of the Bill of Rights, authorized the appointment of paid chaplains. *Marsh v. Chambers*, 463 U.S. 783, 788, 77 L. Ed. 2d 1019, 1025 (1983). Employing chaplains, along with the practice of opening congressional sessions with prayer, continues unfettered, has consistently been followed by most states, and was found constitutional by the United States Supreme Court in 1983. *Id.* at 790-91, 77 L. Ed. 2d at 1026-27. The American armed forces, as well as state and federal prisons, also provide chaplains for their populations. *See, e.g., Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985) (holding that Army's chaplaincy program did not violate the Establishment Clause). In addition, the ceremonial installations and inaugurations of both federal and state elected officials are often accompanied by an invocation or benediction. *Lee v. Weisman*, 505 U.S. 577, 633-34, 120 L. Ed. 2d 467, 510-11 (1992) (Scalia, J., dissenting) (noting that the first act of many of our presidents, including George Washington, was to pray or otherwise invoke a higher power). The United States

STATE v. HASELDEN

[357 N.C. 1 (2003)]

Congress has provided for the national motto reflecting our religious heritage, "In God we trust," 36 U.S.C.A. § 302 (West 2001), and has mandated that it "shall" be inscribed onto our currency, 31 U.S.C.A. § 5112(d)(1) (West 2003). Finally, many federal and state courts open their sessions asking God to save their honorable courts. Given these and "countless other illustrations of the Government's acknowledgment of our religious heritage and governmental sponsorship of graphic manifestations of that heritage," *Lynch v. Donnelly*, 465 U.S. 668, 677, 79 L. Ed. 2d 604, 612 (1984), it is illogical to eliminate biblical remarks in capital cases. However well intentioned it may be, such a blanket prohibition would artificially and selectively eliminate Judeo-Christian precepts of justice from closing arguments, while still permitting arguments arising from other concepts of justice.

America is, as it should be, "a microcosm of world religion," where "[e]very major world religious community is now present in strength." J. Gordon Melton, *Encyclopedia of American Religions* 18 (6th ed. 1999). Yet, of the more than 1,500 religious organizations that exist in the United States, "the overwhelming majority of Americans who engage in any outward religious activity are members of one of the more than 900 Christian denominations," a community that "shows no evidence of declining." *Id.* at 1, 18. It is from this sector of the population that a majority of North Carolina jurors is selected. These jurors, many of whom are cloaked in deeply held Judeo-Christian beliefs, do not automatically leave their religious beliefs on the courthouse steps. Indeed, their belief system would necessarily prohibit such a disavowment. This fact has certainly not escaped the innovative minds of defense attorneys, who argue that the Bible prohibits any type of killing. *See* John H. Blume & Sheri Lynn Johnson, *Don't Take His Eye, Don't Take His Tooth, and Don't Cast the First Stone: Limiting Religious Arguments in Capital Cases*, 9 Wm. & Mary Bill Rts. J. 61, 73-74 (2000) (noting that reported cases and the authors' "own conversations with other defense lawyers[] [led them] to conclude that defense counsel frequently make religious arguments against the death penalty, at least in the South, where [they] practice"). Such religious references are not prohibited under North Carolina law, though this Court has properly noted that "secular law" provides the ultimate rule of decision in criminal cases.

As noted by the majority, this Court recognizes that because defense attorneys make biblical pleas in capital cases, prosecutors often give biblical remarks in anticipation of defense arguments. *See State v. Bond*, 345 N.C. 1, 36, 478 S.E.2d 163, 182 (1996), *cert. denied*,

521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). Even apart from this consideration, biblical arguments are within the acceptable parameters of the law, so long as prosecutors do not contend that the death penalty is divinely *mandated* for a specific defendant.

This is simply not a case where the State told the jury that the Bible required a death sentence for this particular defendant. Further, there is a marked difference between the challenged argument in the case *sub judice* and the arguments in *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002), for example, where the prosecutor compared the defendant's crime to the Columbine High School shooting and the Oklahoma City federal building bombing, *id.* at 132 n.2, 558 S.E.2d at 107 n.2, and characterized defendant as being "lower than the dirt on a snake's belly," *id.* at 132, 558 S.E.2d at 107, in "a thinly veiled attempt to appeal to the jury's emotions," *id.* at 133, 558 S.E.2d at 107.

The majority's legal analysis unmistakably reveals that the prosecutor's biblical argument in the present case is wholly consistent with our prior decisions. I therefore disagree with the dissent's assertion that this Court has failed to act consistently. Rather, this Court, as noted by the dissent, has been entirely consistent—it has refused to reverse capital murder convictions in this State because of biblical arguments. I fail to see how this consistency is in any way a "disservice to litigators and to [this Court] by setting a standard of behavior while consistently excusing deviations from that standard." Virtually *every* capital defendant raises assignments of error challenging the propriety of closing arguments on perhaps every conceivable topic, not just those arising from Judeo-Christian concepts of justice. *See, e.g., State v. Anthony*, 354 N.C. 372, 428, 555 S.E.2d 557, 593 (2001) (challenging whether closing argument was grossly improper where prosecutor's closing remarks included references to what victim may have been thinking as she was dying), *cert. denied,* —— U.S. ——, 153 L. Ed. 2d 791 (2002); *State v. Parker*, 354 N.C. 268, 291-92, 553 S.E.2d 885, 901-02 (2001) (same where prosecutor requested that jury draw conclusions from evidence and use common sense), *cert. denied,* —— U.S. ——, 153 L. Ed. 2d 162 (2002); *State v. Cummings*, 353 N.C. 281, 296-301, 543 S.E.2d 849, 858-61 (same where prosecutor improperly characterized defendant's statements), *cert. denied,* 534 U.S. 965, 151 L. Ed. 2d 286 (2001); *State v. Hardy*, 353 N.C. 122, 135-37, 540 S.E.2d 334, 345-46 (2000) (same where prosecutor commented on the victim's funeral service and noted that the victim's son had prayed for the defendant's forgiveness), *cert. denied,* 534 U.S. 840, 151 L. Ed. 2d 56 (2001); *State v. Grooms*, 353 N.C. 50, 81-82, 540 S.E.2d 713, 732-33

(2000) (same where prosecutor referred to the defendant as "the prince of darkness"), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d 54 (2001).

Grave consequences would result if this Court were to abandon its well-established gross impropriety standard of review in favor of a new legal standard. The stakes in capital murder trials are undeniably high. Counsel typically attempt to zealously deliver a "convincing" or "telling" argument to the jury that may include some moral tenet. These arguments are essentially used to encourage the jury to "do the right thing" and return a favorable verdict in accordance with the law. Therefore, arbitrarily eliminating only one category of argument would unfairly limit the ability of prosecutors to communicate to the jury that the ultimate punishment of death is sometimes appropriate. Likewise, such a standard would unfairly limit the ability of defense counsel to persuade the jury to spare the defendant's life.

Moreover, the effect of the dissent's proposed rule would be inconsistent with the doctrine of *stare decisis* and would constitute a further erosion of this Court's well-settled jurisprudence concerning closing arguments. Finally, and most importantly, the newly-proposed rule would inhibit the duty of capital jurors, who are required to make perhaps the most critical decision of their lives without explanation from trial counsel as to why the punishment of death, or life imprisonment, is not inherently at odds with their own core beliefs.

In the present case, the prosecutor did not argue that the death penalty was mandated by God *for this defendant*, or otherwise inappropriately request the jurors to render a verdict inconsistent with their sworn oaths. Rather, the prosecutor was following and, in fact, preserving the secular law of our state by explaining to jurors that their individual belief systems should not prohibit them from carrying out their duties under our well-established procedures for capital sentencing proceedings. For the reasons stated by the majority, with an emphasis on those discussed herein, I believe that the prosecutor's biblical references during closing arguments do not warrant a new sentencing hearing.

Chief Justice LAKE joins in this concurring opinion.

Justice EDMUNDS dissenting.

I dissent as to the majority's holding that the trial court did not err in failing to intervene *ex mero motu* when the prosecutor made an

argument based upon the Bible. This Court has frequently expressed its disapproval of such arguments.

> We continue to hold that it is not so grossly improper for a prosecutor to argue that the Bible does not prohibit the death penalty as to require intervention *ex mero motu* by the trial court, *but we discourage such arguments*. We caution all counsel that they should base their jury arguments solely upon the secular law and the facts. Jury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials. Although we may believe that parts of our law are divinely inspired, it is the secular law of North Carolina which is to be applied in our courtrooms. Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from their sole and exclusive duty to apply secular law.

*State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643 (citations omitted), *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). In addition to the reasons set out above, such arguments can be inconsistent with the general framework set up by the General Assembly to try capital cases. That arrangement seeks to ensure that the death penalty is enforced as fairly and uniformly as possible. The verdict in a capital case depends on jury findings as to whether aggravating circumstances exist; whether any such aggravating circumstances are not outweighed by mitigating circumstances; and whether, based on these circumstances, the defendant should be sentenced to death or to imprisonment for life. N.C.G.S. § 15A-2000(b) (2001). Moreover, during jury selection, both sides and the judge routinely ask jurors if they hold any moral or religious views that would interfere with their ability to apply the law, and any juror holding such views may be challenged for cause. Judges equally routinely instruct jurors that they must follow the law, even if they do not agree with it. When this Court reviews a capital conviction for proportionality, we consider whether the sentence was based upon passion, prejudice, or any other arbitrary factor. N.C.G.S. § 15A-2000(d)(2). It is inconsistent to allow jury arguments relying on concepts that the jurors have been told at other times during the trial may not control their deliberations.

Although our opinions, not excluding the majority opinion here, have frequently cited to cases in which this Court "has found biblical arguments to fall within permissible margins more often than not," *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence*

*vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990),[1] my research has failed to reveal *any* case where this Court reversed a conviction because of an improper argument based upon religion, *see, e.g., State v. Lloyd,* 354 N.C. 76, 117-18, 552 S.E.2d 596, 625 (2001) (prosecutor's biblical argument not so grossly improper that trial court erred in failing to intervene *ex mero motu*); *State v. Cummings,* 352 N.C. 600, 628-29, 536 S.E.2d 36, 56 (2000) (prosecutor's biblical argument, though inartful, was not grossly improper), *cert. denied,* 532 U.S. 997, 149 L. Ed. 2d 641 (2001); *State v. Braxton,* 352 N.C. 158, 217, 531 S.E.2d 428, 462 (2000) (prosecutor's biblical argument not so grossly improper as to require that trial court intervene *ex mero motu*), *cert. denied,* 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Davis,* 349 N.C. 1, 47, 506 S.E.2d 455, 480 (1998) (prosecutor's biblical argument not so improper as to require trial court to intervene *ex mero motu*), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999); *State v. Walls,* 342 N.C. at 61, 463 S.E.2d at 770 (although the Court has previously disapproved of prosecutorial arguments that made improper use of religious sentiment, biblical argument here was not so grossly improper as to require trial court to intervene *ex mero motu*); *State v. Rose,* 339 N.C. 172, 203-04, 451 S.E.2d 211, 229 (1994) (prosecutor's biblical argument not so grossly improper as to require trial court to intervene *ex mero motu*), *cert. denied,* 515 U.S. 1135, 132 L. Ed. 2d 818 (1995); *see also State v. Rouse,* 339 N.C. 59, 94, 451 S.E.2d 543, 562 (1994), *cert. denied,* 516 U.S. 832, 133 L. Ed. 2d 60 (1995); *State v. Bunning,* 338 N.C. 483, 490, 450 S.E.2d 462, 465 (1994); *State v. Daniels,* 337 N.C. 243, 278-79, 446 S.E.2d 298, 320-21 (1994), *cert. denied,* 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). There are many other nearly identical cases.

As a result, we have a situation where this Court has determined that a certain type of argument is improper, even if not so grossly improper as to require the trial court's intervention *ex mero motu,* but has failed to enforce that determination even once. I believe that this Court has done a disservice to litigators and to itself by setting a standard of behavior while consistently excusing deviations from that standard. Although we have noted that professionalism includes the avoidance by practitioners of all known improprieties, *State v. Rogers,* 355 N.C. 420, 464, 562 S.E.2d 859, 886 (2002), it is difficult to fault an advocate who realizes that he or she can land a telling, possibly decisive, blow at the modest cost of a verbal hand slapping from

1. *See also State v. Davis,* 353 N.C. 1, 28, 539 S.E.2d 243, 262 (2000), *cert. denied,* 534 U.S. 839, 151 L. Ed. 2d 55 (2001); *State v. Walls,* 342 N.C. 1, 61, 463 S.E.2d 738, 770 (1995), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

this Court. Our expectation that arguments based upon religion would be kept within reasonable bounds has not been realized. Either this Court should state that such arguments are proper, or it should enforce its admonitions. Our failure to act consistently may well undermine the validity and enforcement of North Carolina's capital punishment system.

While the argument here was made by a prosecutor, defendants also can and do make religious arguments to the jury as they seek mercy. A review of the reported cases demonstrates that many religious arguments are made by a party to preempt religious arguments that may be made by opposing counsel in an unrebuttable closing argument. Consequently, these arguments feed on themselves as each side rolls out the ecclesiastical artillery. When the Supreme Court of Pennsylvania faced just this problem, it finally banned such arguments in capital litigation. *Commonwealth v. Chambers*, 528 Pa. 558, 586, 599 A.2d 630, 644 (1991), *cert. denied*, 504 U.S. 946, 119 L. Ed. 2d 214 (1992). That court stated:

> In the past we have narrowly tolerated references to the Bible and have characterized such references as on the limits of "oratorical flair" and have cautioned that such references are a dangerous practice which we strongly discourage. We now admonish all prosecutors that reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action.

*Id.* (citations omitted). Nor is Pennsylvania alone in condemning such arguments. The United States Court of Appeals for the Fourth Circuit has observed that "[f]ederal and state courts have universally condemned such religiously charged arguments as confusing, unnecessary, and inflammatory." *Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir.), *cert. denied*, 519 U.S. 1002, 136 L. Ed. 2d 395 (1996).

I do not believe that we should go so far as Pennsylvania, for there is a place for religious and moral arguments in our jurisprudence. However, in order to give guidance to litigators and judges, this Court should hold that any argument that essentially asks a jury to base its decision on moral or religious grounds instead of on the law and the evidence is improper and grounds for reversal.

In the case at bar, the prosecutor warned the jury that defendant might quote the Bible to assert that the death penalty was contrary to Christian ethics. He then went on to say:

You see, just a few verses below that, right after that thou shalt not kill, just a few verses below it it says, he that smiteth a man so that he die shall surely be put to death. Just a few verses below that. I suggest to you that that is [b]iblical authority for the death sentence. Not a mandate that you do it in any one case, but it is the authority for those of you [who] worry about that.

. . . .

Ladies and gentlemen of the jury, North Carolina Statute 15A-2000 is a statute of judgment. That is simply that, a statute of judgment. And what does it say in the Bible about a statute of judgment? A statute of judgment unto you throughout your generations in all your dwellings. Whosoever killeth any person, the murderer shall be put to the death by the mouth of witnesses. Moreover ye shall take no satisfaction for the life of a murderer which is guilty of death, but he shall surely be put to death. That's the statutes of judgment.

. . . .

You know, I'm going to make one more comment about the Bible. If you ever had any doubt—this in the New Testament, I understand. If you ever had any doubt about capital punishment in the Bible, remember when Jesus was on the cross, beside of [H]im on each side, if I recall correctly, is two thieves. He told one of them, [H]e said, you'll be in Heaven with me today, some words to that effect. Now, [H]e had the power to take [H]imself away from justice and get down off of that cross. He had the power to take those two criminals down and put them on the ground and let them walk away, but [H]e didn't, did [H]e? It's probably why we say, God have mercy on your soul, because [H]e said a soul [sic], or at least that one. But [H]e didn't take justice away from man. He didn't take them down off the cross. That's the strongest argument I can think of. He could have done it right then and there if [H]e had wanted to, but [H]e didn't.

Other religious references may be found throughout the argument.

I view this argument as designed to persuade the jury that the Bible and Jesus sanctioned the imposition of the death penalty in this case. In light of *Williams* and the other considerations discussed above, it is apparent that the religious arguments made here by the prosecutor had the potential unfairly to arouse the passions of the jury, resulting in a sentencing recommendation based upon religious

sentiment rather than the capital sentencing procedure mandated by the laws of this state. As this Court has so often stated in the past, this argument was improper. Accordingly, I respectfully dissent as to this issue.

Justice ORR joins in this dissenting opinion.