[T]he sheriff has a right to determine the safety of the community in the courtroom based on his experience with what this man has done. Because he's been charged with that-and the State believes it did happen-the ankle bracelets are a very minor thing to keep him in control. But he is charged with that assault, Your Honor, and attempted jail escape.
Defense counsel stated that it was his understanding that Applicant was wearing a "shock belt," but the bailiff and the prosecutor responded that Applicant was not in fact wearing a shock belt because they "decided not to do it."
The trial judge then said, "Get a board, put it on this side of the lawyers' table, so they can't see his feet. That's what we've done in some other places. During the lunch hour, get a board." In response to the prosecutor interjecting, "Can we put it across the bar there?" the trial judge stated, "He is saying during the jury trial. I'm saying during the jury trial we'll have a board here on this side of the table where they can't see his legs. What's wrong with that?" Another prosecutor responded, "Not a thing, Judge." The trial judge then *194 asked defense counsel, "Isn't that what-will that satisfy you?" One of the defense attorneys replied, "That's fine. We don't want-," to which the trial judge then responded, "Just get a big board and put it on this side of the table."
B. Trial
The jury convicted Applicant of burglary of a habitation. After hearing about Applicant's numerous extraneous offenses, the jury assessed a sixty-year sentence. The jury was polled, and each individual juror affirmed that the verdict was his or her own.
C. Habeas Application
In December 2016, Applicant filed a habeas application raising three grounds. In ground one, he alleged that his "right to due process and a fair trial was violated when he was shackled during trial." He alleged that he was in handcuffs and shackles, that jurors saw him in handcuffs and shackles, and that jurors felt that he was a danger and could not be trusted. He claimed that this resulted in the jury assessing a greater sentence. In his memorandum of support for his application, he faulted the trial judge for failing "to state on the record or hold a hearing regarding shackling" and for failing to "state on the record sufficient reasons for shackling." He further argued that the shackling was unconstitutional because "no essential state policy was served by compelling Applicant to be shackled." He claimed that the shackling was inherently prejudicial and "a new trial should be ordered since the record fails to reflect conduct by the Applicant justifying the shackling."
In ground two, Applicant claimed that trial counsel was ineffective. He alleged that trial counsel objected to him being shackled in view of the jury but that the trial judge did not rule on this objection and did not hold a hearing to determine whether he should be shackled or a lesser form of restraint used. Applicant contends that counsel was ineffective for failing to object to the trial judge's failure to rule or to hold a hearing.
In ground three, Applicant claimed that appellate counsel was ineffective for failing to file a motion for new trial on the shackling issue and failing to raise the issue on appeal.
The affidavits of two jurors were submitted in support of the application. Juror Javier Acevedo's affidavit stated that Applicant was wearing leg irons and handcuffs during the trial and that the juror now felt that the sentence was too long because no one was hurt and the victim got all of her belongings back. The affidavit also stated that seeing Applicant in leg irons and handcuffs made Acevedo "feel like [he] was in danger." Juror Lilia Virgen's affidavit stated that she observed Applicant wearing leg irons during trial and felt that "he was not being trusted" to sit in court and listen to the case. Her affidavit also stated that she felt that the sentence of sixty years was too long and said, "We could have given him forty years instead of sixty to rehabilitate him to become a better person when he came out."
D. Habeas Hearing
1. Stipulations
A hearing on the habeas application was held in June of 2017. The parties agreed that Applicant's legs had been shackled at trial, that "an objection was made to him being shackled," and that there was no adverse ruling on the objection. It was also noted that the trial judge in this case had died.
2. Juror Virgen
Juror Virgen testified that she did not see Applicant enter the courtroom in *195 shackles, nor did she ever hear the shackles. She further testified that there was a board around the defense table that kept her from seeing Applicant's legs during the guilt stage of trial. She stated, however, that she saw Applicant's legs in shackles at the defense table during the punishment stage of trial. She explained that the difference between the two stages was her vantage point: one side of the table was not blocked off, and she sat in a different seat in the jury box (seat seven) during the punishment stage than at the guilt stage. So, while she could not see Applicant's legs from her vantage point during the guilt stage of trial, she could see his legs from her vantage point during the punishment stage. She further testified that if the side of the table that she saw Applicant's legs through had been blocked off, she probably would not have seen the shackles. Juror Virgen and the other jurors did not talk about shackles.
Juror Virgen indicated that she was not denying that Applicant was guilty. When asked whether seeing Applicant in shackles at the punishment stage made her think "that he might be a danger and that's why he was chained up like that," she responded, "No, sir." When asked whether she was "worried about him security-wise in the courtroom" and that was why he was in shackles, she responded, "I wasn't." When asked what she meant by the statement in her affidavit that Applicant "was not being trusted," she said, "I felt he wasn't getting a fair trial with the shackles on." When asked for further clarification regarding who did not trust Applicant-whether it was the Sheriff's Office, the prosecutor, the judge, or all three-she responded that she was "thinking more the Sheriff's Office."
3. Juror Acevedo
Juror Acevedo testified that he sat in seat number two in the jury box during the entire trial. He said that he saw Applicant in both handcuffs and leg irons. He said that Applicant's hands were on the table and that he saw the handcuffs there. When asked whether anything obstructed his view of the leg irons, Acevedo responded, "No, sir."
Juror Acevedo further testified that he thought that the jury gave Applicant too many years. When asked if the judge asked him by name if the sixty-year sentence was his verdict, Acevedo answered, "No." When asked if he said in his affidavit that the leg irons on Applicant made him feel like he was in danger, Acevedo, replied, "No." When asked for further clarification, Acevedo stated, "The investigator asked me if that made me feel in danger, and I said no." When confronted with the inconsistency between his hearing testimony and his affidavit, Juror Acevedo stated that he did say that he felt he was in danger. When he was then asked, "It's fair to say you felt in danger because of his restraints," Acevedo responded, "Actually I felt unsafe."
When asked whether he knew Applicant, Juror Acevedo responded, "Just by person, but not by name or anything." Acevedo further stated that he knew "[j]ust who he was. That's it, but never talked to him before." When asked whether he knew any of Applicant's extended family-cousins, uncles, brothers-Acevedo responded, "Some of his family, but I don't talk to them." When asked, "Have any of them talked to you about this?" Acevedo responded, "No."
4. Other Jurors
Keith Butler, the foreman of the jury in this case, testified that he did not see Applicant's feet during trial because the defense table was enclosed by a barrier of wood or cardboard. He further testified *196 that even the side of the table was enclosed. Butler stated that he never saw shackles on Applicant and that Applicant "was seated when we came in, and was seated when we left." He further testified that he did not see Applicant's hands and did not recall seeing any type of handcuffs.
Joshua Onderek, another member of Applicant's jury, testified that he did not see Applicant in handcuffs or ankle shackles during the trial. He further testified that there was a cardboard barrier around the front and side of the table that blocked him from seeing Applicant's feet.
5. Bailiff
Jody Harris, the bailiff at Applicant's trial,[1] testified, "We took every precaution possible to keep [Applicant] away from the jury, make sure the jury was already in the jury room in the mornings and that they were already gone before we took him back to the jail in the afternoons after trial." He stated that Applicant remained seated at all times while the jury was in the courtroom. Harris affirmed that Applicant was wearing ankle bracelets during trial but that he was not wearing handcuffs. Harris testified that a barrier was constructed around the ends of the table and in front so that the jury would not be able to see Applicant in shackles. Harris affirmed that the table was "covered completely" so that the jury could not see underneath the table at all-that it was covered "from the floor to the bottom of the desk" and there were no gaps. When asked if he went in front of the jury box to see if he could see under the table, Harris responded that he had: "That was one of the things that we made sure of."
6. Defense Attorneys
Applicant's defense attorneys at trial were Orlando DeHoyos and Tom Williams. During trial, Applicant sat between his attorneys. DeHoyos testified that Applicant was wearing leg irons prior to jury selection and that the jury panel went through a number of questions before an objection was made. DeHoyos testified that he thought some of the venire panel could see the leg irons.
DeHoyos indicated that he objected to Applicant wearing shackles. He first claimed that the trial judge "denied" his objection, then stated that there was a "compromise," and then testified that the judge did not make a direct ruling on the objection. When asked whether he was ineffective for failing to obtain a ruling, DeHoyos stated "looking back, maybe-perhaps we should have gotten a ruling" but "we thought that in effect we did get a ruling" that "would keep the leg irons away from the visibility of the jury." DeHoyos also stated that there was no strategy for not objecting to the trial judge's failure to put on the record his justification for the shackling. When asked if he knew the justification for shackling, DeHoyos said he did not know for a fact but had a suspicion that it was because of a charge against Applicant for assaulting a deputy during the same year as the trial.
DeHoyos stated that a cardboard barrier was placed against the table "to make sure that none of the jurors were able to-to make note of the shackles or leg irons being worn by [Applicant]." He stated that the barrier was on the side of the table facing the jury. He did not remember whether there was a barrier on the front but there might have been. When asked whether the rustling of chains could be heard, DeHoyos stated that he could not "recollect that being any kind of an issue with me." He also stated that the jury *197 never saw Applicant enter the courtroom with leg irons on.
DeHoyos testified that the defense team had an investigator but that he did not recall instructing the investigator to talk to any jurors after trial. He did recall that, shortly afterwards, another attorney substituted to handle Applicant's appeal. DeHoyos did not recall the trial defense team telling the appellate attorney about the shackling issue that had arisen during trial.
Williams testified that he had originally expected Applicant to be in a "shock belt" that would be underneath his clothing, but a prosecutor had indicated that the shock belt was being used "in some other matter." Williams further recounted that the prosecutor had expressed concern about Applicant's potential to escape since he had recently been charged with felony escape from a jail and assaulting an officer.
Williams explained that he had objected that Applicant could not get a fair trial if the jury saw him in shackles. He thought it was "probably correct" that he did not obtain a ruling from the judge on the record. However, he recalled the trial judge instructing the bailiff to construct a barrier across the defense table to prevent the jury from seeing the shackles. Williams stated that the barrier was on both the front and side of the table and reached from the floor to the bottom of the table. He remembered looking at the setup from where the bailiff was sitting "to see if I could see the shackles, and I couldn't see the shackles."
When questioned about whether any prospective jurors saw Applicant in shackles during jury selection, Williams indicated that they had not. He stated that it would "surprise" him to hear that prospective jurors saw Applicant shackled in voir dire and further stated, "I'm certainly-I don't recall the jury-the jury member sitting in that box there seeing [Applicant] in shackles and in cuffs." After reviewing the portion of the court reporter's record containing the discussion about shackles, Williams explained that none of the members of the venire were sitting in the jury box during jury selection, and consequently, "no jury panel was selected and sitting there with [Applicant] in chains without that cardboard covering." Williams was not exactly sure where Applicant was during jury selection, but, to his best recollection, the defense "would have turned the chairs around."
When asked whether his representation constituted ineffective assistance of counsel, Williams replied, "No." Williams acknowledged that no one from the defense team contacted any jurors after trial. When asked whether he ever hired an investigator to talk to the jury after trial to find grounds for reversal, Williams responded, "After the fact, I would say never." When asked if that is something he would expect an attorney to do, Williams said, "No, not a court-appointed attorney who was not representing the defendant on appeal."
7. Prosecutor
One of the prosecutors at Applicant's trial-Steven Smith-testified that Applicant was in ankle bracelets, but not handcuffs, at trial.[2] He testified that Applicant was shackled because he had assaulted a deputy, inflicting serious bodily injury, while attempting to escape from jail. This made Applicant an escape risk, which prompted shackling his feet as a safety *198 precaution. Smith stated that Applicant was brought in and out of the courtroom when the jury was not present and that a covering was placed around the defense table to keep the jury from seeing the shackles. Smith had moved about the courtroom at various times during trial and could not see the shackles from any vantage point on the jury's side of the courtroom.
Smith stated that it was the conscious decision of the prosecutors not to mention the escape offense at all during the trial "so that we could try a second case later."
Smith did not feel that Applicant's attorneys were ineffective. He had occasionally known of a defense attorney who questioned jurors after trial, but most of the time that did not occur, and in his opinion, an attorney would not be ineffective for failing to do that. He also pointed out that the jurors were polled on their verdict.
E. Oral Arguments and Oral Findings
In closing arguments at the habeas hearing, habeas counsel conceded that he had only shown that jurors saw Applicant in shackles at the punishment stage of trial, rather than during voir dire or the guilt phase. Counsel contended that the habeas court should believe the testimony of two jurors seeing Applicant in shackles and that Applicant was entitled to a new punishment hearing.
The habeas court orally concluded that Juror Virgen's position in seat number seven (at punishment) was a unique vantage point that allowed her to see behind the counsel table and thus see Applicant in shackles.
The habeas court also found credible that the two jurors saw the shackles, but the court was uncertain about whether harm was shown. The court indicated that harm probably was not shown because the jurors were polled and their conclusion that the sentence was too long was "after the fact," but the court entertained argument on the matter.
The habeas prosecutor then asked for clarification about whether the other witnesses were credible besides the two jurors who claimed to see the shackles: "When you say these witnesses were credible, does that mean the rest of the witnesses were not credible?" The habeas court responded, "No. No, they were credible." Following that statement, there was a discussion about the fact that other jurors did not share Juror Virgen's unique vantage point. The habeas prosecutor pointed out that Juror Acevedo testified that Applicant was in handcuffs, and the habeas court responded that "a lot of people were mistaken on a lot of stuff," and he did not find that part of Acevedo's testimony to be credible, but he did find the testimony about seeing Applicant in ankle cuffs to be credible.
The habeas prosecutor also pointed out that Virgen's testimony was not based on her seeing behind the table, but the habeas court found that her testimony was "credible enough." The habeas court then stated that even if Acevedo's testimony were disregarded, that would still leave Virgen as having seen the shackles, "I've got one or two jurors that saw the-that's not really where it's at-you know, that there was just one. Let's say, you know what, Mr. Acevedo maybe didn't; but you still have that one."
F. Written Findings of Fact and Conclusions of Law
We focus on what appear to be the most relevant portions of the habeas court's written Findings of Fact and Conclusions of law. With respect to Applicant's improper-shackling claim, the habeas court found, among other things:
*199 3. ... The trial judge did not rule on counsel's objection to the shackling, and counsel did not object to the judge's failure to rule on the shackling objection.
4. ... Mr. Acevedo is credible and believable on the issue that he saw [Applicant] in shackles.... Mr. Acevedo saw the Applicant shackled while the Applicant was sitting in the courtroom during the trial. Seeing the Applicant shackled made Mr. Acevedo believe that Mr. Acevedo was in danger from the Applicant. Mr. Acevedo felt unsafe when he saw Applicant shackled in the courtroom.... Mr. Acevedo now feels that "the sentence should of been a lot shorter in time."
5. ... Ms Virgen is credible and believable.... Ms Virgen saw the Applicant shackled while the Applicant was sitting in the courtroom during the punishment phase only. Ms. Virgen felt that the Applicant was dangerous since "he was not being trusted to s[i]t in court and listen to the case with the leg irons."
6. At the conclusion of the habeas hearing, this Court stated on the record that the Court found Mr. Acevedo and Ms. Virgen believable and credible and that these jurors did see the Applicant shackled during the punishment phase of the jury trial.[3]
In the section entitled "conclusions of law" on this claim, the habeas court found, among other things:
4. ... [A] harmless error analysis does not apply to this case. This Court holds the State to the burden of proving beyond a reasonable doubt that the shackling error did not contribute to the verdict obtained. The State has not met this burden.
* * *
10. In the case at bar, defense counsel stated that the shackles would cause the jury to infer that the Applicant was guilty. The trial judge failed to hold a hearing regarding whether or not the Applicant should be shackled or whether some other less intrusive restrain[t] should be used.... The trial judge did not rule on counsel's objection to the shackling, and counsel did not object to the judge's failure to rule on the shackling objection. The shackling of the Applicant resulted in two jurors believing that the Applicant was a danger to the jurors in the courtroom or was not trusted.
11. The employment of restraints cannot be justified based on a general appeal to the need for courtroom security or simple reference to the severity of the charged offense. A trial court must state with particularity its reasons for restraining a defendant.... No such determination was made by the trial judge that legally justified the use of shackling.
12. In order to determine whether the trial judge abused its discretion to impose particular security measures, the trial judge is required to place on the record the reasons for its decision to use such measures. The trial judge did not take any steps necessary to justify using shackles to restrain Applicant at trial. There are no findings by the trial judge on critical matters relating to shackling.... The trial judge did not consider any less restrictive alternatives to ensure the safety of those in the courtroom (or that there was even a safety issue).
13. In the complete absence of factual findings or consideration of alternate methods of restraint, or even the need for restraints, the trial judge's decision for imposing this method of restraint is *200 not supported by the record[;] therefore, the trial judge abused its discretion in this matter.
* * *
15. ... Forcing Applicant to wear shackles, without justification articulated into the record by the trial judge, created a risk that impermissible factors could have come into play in the determination of punishment.... This Court recommends the Applicant receive a new punishment hearing.[4]
In the "conclusions of law" section relating to Applicant's claim that trial counsel was ineffective, the habeas court found, among other things:
7. The performance of defense counsel was deficient by failing to obtain a ruling on an objection of the shackles of the Applicant. This deficient performance prejudiced the defense by preventing the Applicant from raising on appeal the issue of the improper shackling of the Applicant. This Court recommends that the Applicant receive a new punishment hearing.
In the "conclusions of law" section relating to Applicant's claim that appellate counsel was ineffective, the habeas court found, among other things:
10. ... Appellate counsel failed to raise on direct appeal this issue of the improper shackling of the Applicant.
11. The performance of appellate counsel was deficient by failing to file a motion for new trial regarding the improper shackling of the Applicant or by raising on direct appeal the issue of the improper shackling of the Applicant. This deficient performance prejudiced the defense by preventing the Applicant from raising on appeal the issue of the improper shackling. The Applicant should receive a new direct appeal.
II. ANALYSIS
A. Procedural Issues
With respect to his due process claim, Applicant has argued, and the habeas court has found, that the trial judge failed to hold a hearing on the shackling issue and failed to issue findings justifying the shackling. Applicant has procedurally defaulted this claim. Ordinarily, when a defendant has had the opportunity to raise a claim at trial or on appeal and failed to do so, he cannot later raise the claim on habeas.[5] It is undisputed that no claim associated with shackling was raised on appeal, and the parties and the habeas court appear to agree that defense counsel did not obtain an adverse ruling at trial.[6]
*201 But Applicant's complaint about the trial court's conduct also serves as part of his ineffective-assistance-of-counsel claims, and ineffective assistance claims are ordinarily cognizable on habeas.[7] Consequently, we will address whether the trial court committed any error at trial in connection with Applicant's shackling.
B. The Trial Court Committed No Error
In Deck v. Missouri , the Supreme Court recognized the longstanding rule that the Constitution forbids the routine use of visible shackles on defendants during the guilt stage of trial.[8] The Court was called on to decide whether this constitutional prohibition also applies at the penalty stage in a capital case, and it concluded that it did.[9] During a punishment retrial in his capital murder case, Deck was placed in handcuffs, leg irons, and a belly chain-all visible to the jury.[10] Defense counsel objected to the shackles, but his objection was overruled.[11] The Supreme Court found that the severity and finality of the death penalty sanction made it no less an important decision than the decision about guilt.[12] The Court also concluded that the use of visible shackles "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community-often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even when the State does not specifically argue the point."[13]
The Supreme Court concluded that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case."[14] The reasons for shackling must be "case-specific," reflecting particular concerns about the defendant, such as any special security needs or escape risks posed by him.[15]
The Supreme Court faulted the trial court in Deck for failing to make any formal or informal findings other than to say that Deck had already been convicted.[16] The Supreme Court also faulted the trial *202 court for not providing "shackles that the jury could not see"-an arrangement that had apparently been used at Deck's initial trial.[17]
Finally, the Supreme Court held applicable to this type of error the usual harm analysis that applies to constitutional errors: that the error is harmful unless the State proves beyond a reasonable doubt that the error did not contribute to the verdict.[18] This harm analysis applies "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury."[19]
In Bell v. State , we explained that no constitutional violation occurs if the shackles are not visible to the jury.[20] Shackles are considered visible for constitutional purposes if "the record reflects a reasonable probability that the jury was aware of the defendant's shackles."[21] Even when shackles are not visible to the jury, however, shackling a defendant during trial is non-constitutional error in violation of the common law unless it is necessary for a particular defendant in a particular proceeding.[22] For shackling to be justified, "the record must manifest the trial judge's reasons for restraining a defendant," and a trial judge errs in ordering shackles if "the record fails to detail the grounds for restraint."[23] And even when shackles are justified, "the trial judge should make all efforts to prevent the jury from seeing the defendant in shackles."[24]
The question we confront now is whether the trial judge in Applicant's case committed any error under Deck or Bell . We conclude that he did not. At trial, defense counsel objected to Applicant being seen in shackles by the jury, but an objection was never lodged to Applicant actually being in shackles .[25] This is not simply a matter of semantics. One of the prosecutors offered a specific reason for shackling Applicant-the attempted escape offense[26] -and the defense never claimed that Applicant should not be shackled. The closest the defense attorneys came was to inquire about an earlier decision to place Applicant in a shock belt, but when told that it had been decided not to use the shock belt, the defense never suggested that shackling would be inappropriate. The defense attorneys never suggested that a *203 hearing was needed on shackling, nor did they ever object to the trial court's failure to make findings to justify the shackling. When asked whether the trial court's proposed arrangement to block the jury's view of the shackles satisfied defense counsel, one of the defense attorneys replied affirmatively.
The habeas court concluded that the trial judge did not hold a hearing on shackling, but we think that this conclusion is not supported by the record. The trial judge heard the State's reasons for shackling and gave the defense the opportunity to respond to those reasons. After hearing the parties, the trial judge fashioned a remedy that satisfied them all. When faced with a prosecutor expressing a particular need for shackling this particular defendant, and with the defense's apparent agreement or at least acquiescence in the need to do so, the trial judge was within his discretion to permit the shackles without holding a more detailed hearing.
The habeas court also concluded that the trial judge failed to consider lesser remedies than shackling. It is questionable whether the trial judge even needed to consider lesser remedies since the parties appeared to agree that shackling was justified. Even so, the record contains a statement that use of a stun belt was considered and rejected as an option, and the habeas record indicates that there was only one stun belt in the jurisdiction and that it was being used in another matter.
The habeas court also concluded that the trial judge failed to make findings on the issue of shackling. We conclude that the trial judge made an implicit finding. The State articulated a particular reason for shackling, and the trial judge responded with the statement, "Get a board.... That's what we've done in some other places." This was an implicit acceptance of the prosecutor's reason for shackling. And since the defense had also implicitly accepted the prosecutor's reason for shackling and had explicitly accepted the trial judge's proffered remedy, we see no error in the trial judge's failure to explicitly memorialize the reason for allowing Applicant to be shackled.
And as the trial record indicates, and the habeas record further supports, actions were taken to comply with Bell to keep the jury from seeing the shackles. The trial record shows that the trial judge ordered the jury's view of the shackles to be blocked, and the habeas record indicates that a barrier was placed around the defense table to do that. The bailiff and at least one of the defense attorneys reviewed the setup to make sure that the shackles would not be visible to the jury. As far as the judge and the parties knew, the barrier was effective; they had no inkling that, despite their best efforts, one or two of the jurors might see the shackles at some point during the trial. Under these circumstances, we do not discern any error on the part of the trial judge.
C. Defense Attorneys Did Not Perform Deficiently
To prevail on an ineffective assistance claim, an applicant must show that counsel's performance was deficient and that applicant was prejudiced.[27] Scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight.[28] Counsel's performance should be judged by whether it is reasonable "under *204 prevailing professional norms."[29]
The habeas court found that the trial judge did not rule on defense counsel's objection to the shackling, but this finding is not supported by the record. Applicant's trial attorneys did not object to Applicant being shackled; they objected to Applicant being seen in shackles. On the objection that was made, the trial court indeed issued a ruling-a favorable ruling, granting relief. Defense counsel asked that the jury not be allowed to see Applicant in shackles, and the trial court ordered exactly that-that a barrier be placed around the defense table to hide the shackles from the jury.
It is true, as the parties conceded, that Applicant did not receive an adverse ruling, but that is because the trial court granted the relief sought. The State proffered a facially plausible reason for placing Applicant in shackles-his recent attempted escape.[30] Applicant has produced no evidence-at trial or on habeas-to rebut this reason or to otherwise suggest that it was insufficient. With the knowledge of the escape offense, defense counsel could have reasonably believed that there was no point in contesting Applicant being placed in shackles.[31] Moreover, a defense attorney could have reasonably believed that the order to hide the shackles from the jury would render the shackling harmless in any event. Consequently, Applicant has not shown that his trial attorneys were deficient.[32]
The habeas court faulted Applicant's appellate counsel for failing to raise the shackling issue on direct appeal. But, since we have concluded that the trial judge committed no error in connection with shackling, there was no viable point of error to raise on appeal.
The habeas court also faulted Applicant's appellate counsel for failing to raise the shackling issue in a motion for new trial. As we have discussed above, Applicant has not even now demonstrated that the State's justification for shackling was insufficient, so he cannot show that he would have demonstrated such an insufficiency in connection with motion for new trial proceedings.
We conclude that Applicant's appellate attorneys were not deficient for failing to raise a shackling claim on appeal, nor were any of his attorneys deficient in connection with the failure to raise a shackling claim in a motion for new trial.
*205 III. DISPOSITION
Having rejected Applicant's claims, we deny relief.

At the time of the habeas hearing, Harris was a Justice of the Peace.

Smith initially testified that Applicant was not shackled until after the jury was already selected, but it was later pointed out to him that his memory was faulty because the record showed that Applicant was in shackles during jury selection.

Citations omitted.

Citations omitted.

Ex parte Beck , 541 S.W.3d 846, 853-54 (Tex. Crim. App. 2017) ("Our cases have recognized that questions of error preservation on appeal and in collateral habeas proceedings are substantially overlapping and that 'the requirement in each context informs the other.' By holding that a facial challenge to a statute implicates a Marin category-three forfeitable right that must first be raised in the trial court and may not be complained of for the first time on direct appeal, Karenev signaled by extension that this type of complaint generally may not be presented for the first time at the even later stage of post-conviction review, when the added concern for the State's interest in the finality of its judgments weighs heavily against permitting consideration of such complaints.") (citation omitted); id. at 852 ("As a general matter, this Court has held that complaints that could have been raised on direct appeal cannot be raised on post-conviction habeas review.").

A number of courts in other jurisdictions have held that a failure to raise an issue associated with shackling results in forfeiting the claim, or at best relegates the defendant to having to show fundamental error. State v. Torres , 413 P.3d 467, 482 (N.M. 2018) (no objection to shackling and no request for a hearing, so must show fundamental error); People v. McWhorter , 47 Cal. 4th 318, 375, 97 Cal.Rptr.3d 412, 212 P.3d 692, 733 (2009) ("Moreover, although defense counsel made the request that defendant be unshackled, he thereafter acquiesced in the remedy selected by the trial court-removal of the visible waist chains-and made no further objection, thereby waiving any claim on appeal with respect to the absence of further inquiry into the manifest need for the concealed leg restraints."); State v. Haselden , 357 N.C. 1, 11, 577 S.E.2d 594, 601 (2003) (no objection voiced at trial to defendant being restrained in shackles, so error procedurally barred, and not entitled to plain error analysis because matter was largely within discretion of trial court); Buckner v. State , 714 So.2d 384, 388 (Fla. 1998) (defense must object to shackling and request inquiry into necessity of shackling to preserve issue for review); Williams v. State , 304 Ark. 218, 219, 800 S.W.2d 713, 717 (1990) (mistrial request on the basis of shackles untimely, and thus unpreserved, when made well into trial, almost at the end of the State's case).

Rylander v. State , 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

544 U.S. 622, 624, 626-29, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).

Id. at 624, 632-33, 125 S.Ct. 2007.

Id.case-ids="5869317" index="17" url="https://cite.case.law/us/544/622/#p624"> at 625, 125 S.Ct. 2007.

Id.

Id. at 632, 125 S.Ct. 2007.

Id.case-ids="5869317" index="22" url="https://cite.case.law/us/544/622/#p624"> at 633, 125 S.Ct. 2007.

Id. at 632, 125 S.Ct. 2007.

Id.case-ids="5869317" index="26" url="https://cite.case.law/us/544/622/#p624"> at 633, 125 S.Ct. 2007.

Id.case-ids="5869317" index="28" url="https://cite.case.law/us/544/622/#p624"> at 634, 125 S.Ct. 2007.

Id. at 634-35, 125 S.Ct. 2007.

Id. at 635, 125 S.Ct. 2007 (citing Chapman v. California , 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Id.

415 S.W.3d 278, 279 (Tex. Crim. App. 2013). We assumed, but did not decide, that a constitutional violation from non-visible shackles could occur if the shackles interfered with the defendant's ability to communicate with his attorney, to participate in the trial, or to testify. Id. at 283. There was no showing of any such interference in the defendant's case. Id. There is also no showing of any such interference in Applicant's case, so we need not address the matter further.

Id. at 283.

Id. at 281.

Id.

Id.

See Canales v. State , 98 S.W.3d 690, 697-98 (Tex. Crim. App. 2003) (similar fact situation where this Court "assumed" that error was preserved without deciding whether it was).

See Cooks v. State , 844 S.W.2d 697, 723 & n.17 (Tex. Crim. App. 1992) (noting violent outbursts and threats at the jail as a probable impetus for the Sheriff's department's recommendation to shackle the defendant); Marquez v. State , 725 S.W.2d 217, 229 (Tex. Crim. App. 1987) (shackling of defendant justified "to prevent his escape or self-destruction and to protect other persons present in the courtroom").

Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Id. at 690, 104 S.Ct. 2052.

Id. at 688, 104 S.Ct. 2052.

Defense counsel also was likely aware of Applicant's history of evading arrest or detention-which the jury learned at the punishment stage of trial.

There was a potentially large downside to doing so: The State was apparently not prepared to go into the escape offense at Applicant's burglary trial, but if the defense forced the State to marshal witnesses on the escape offense for a hearing on shackling, then the State might have decided to also introduce that evidence at the punishment stage.

The habeas court concluded that Applicant suffered prejudice because the defense was prevented from raising the issue of improper shackling on appeal. But that is not the proper focus of the prejudice inquiry here. Since the deficient performance is being alleged to have occurred at trial , the proper focus would be whether there would be a change in the outcome of the trial-or some part of the trial, such as the punishment stage. Part of the reason we should not focus on appeal in this situation is that, if the objection that was not made had been made, the trial judge might have taken further remedial action, eliminating any issue for appeal. For example, had defense counsel asked for a more detailed hearing or for explicit findings, the trial judge might well have acceded to those requests. In any event, because we conclude that Applicant's trial attorneys were not deficient, we need not address the issue of prejudice.